NIMMONS, Judge.
The Department of Transportation (Department) appeals from a circuit court declaratory judgment in which the court found that the Silver Palm, a passenger train operating to and from Tampa and Miami, was entitled to continue to be funded by the State beyond November 20, 1984.[1] The circuit court withheld issuance of a coercive writ upon the assumption that the Department would abide by the court’s ruling and continue funding. We find that the circuit court erred and reverse.
The Silver Palm, a rail service development project[2] under Section 341.301(2), Florida Statutes, provides a train service governed by Section 403(b) of Public Law 91-518 (the AMTRAK law) under which AMTRAK runs the train and finances a portion of the expenses with the state also bearing a portion of the expenses. The *405 Silver Palm has been providing daily service since November 1982.
In 1984 the Legislature, through the enactment of Chapter 84-333, Laws of Florida, created Sections 341.301-341.303, Florida Statutes,[3] which attempted to articulate the Department’s role with respect to the rail component of the state transportation plan for which plan the Department was responsible under the previously enacted 1978 Florida Public Transit Act (Sections 341.011-341.061, Florida Statutes),
In the 1984 Appropriations Act, Chapter 84-220, Laws of Florida, line item 1593 *406 appeared as follows with the following condition:
AID TO LOCAL GOVERNMENTS MASS TRANSIT MATCHING GRANTS
FROM GRANTS AND DONATIONS TRUST FUND . 110,000
FROM WORKING CAPITAL TRUST FUND. 39,900,313
Of the funds provided in Specific Appropriation 1593 for the operation of the Silver Palm passenger train, $576,000 is contingent upon CS/SB 869 or similar legislation, extending transit service development beyond two years, becoming law.
The bill referred to as CS/SB 869 was indeed enacted and became Chapter 84-333, supra. The particular provision thereof which spawned the instant litigation is Section 341.303(4)(d) which provides:
(d) Any service development project funded under this section shall continue to be eligible for such funds in the third year of operation only if the project reaches an operating ratio of 60 percent or more during the second year. All intercity and commuter rail service development projects shall be limited to 3 years.
The Department, having determined that the Silver Palm failed to reach the statutorily provided 60% operating ratio, announced that it would cease funding the Silver Palm effective November 20, 1984. The Florida Coalition of Rail Passengers, Inc. (Coalition)[4] filed a suit for mandamus and injunctive relief by which the Coalition sought to force the Department to continue funding the Silver Palm. The Coalition contended that the Department was erroneously applying the statute in determining the Silver Palm’s operating ratio by not including the federal AMTRAK contribution. After an evidentiary hearing, the circuit court decided to treat the Coalition’s suit as one for declaratory judgment and entered final judgment in favor of the Coalition finding that the Department improperly excluded federal AMTRAK funds in determining the Silver Palm’s operating ratio.
An agency's construction of a statute it administers is entitled to great weight and is not to be overturned unless clearly erroneous. Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815, 820 (Fla.1983); Pan American World Airways, Inc. v. Florida Public Service Commission, 427 So.2d 716, 719 (Fla.1983); Kirk v. Weston Contracting Corporation, 216 So.2d 503 (Fla. 1st DCA 1969).
The parties agree that “operating ratio” is revenues divided by costs. The dispute is over whether the federal AMTRAK subsidy should be included as revenue in the operating ratio. At the final hearing in the lower court, the only testimony or evidence offered was that introduced by the Department. The evidence showed that the Department construed the term “operating ratios” in such a way as to exclude consideration of federal subsidies. The evidence further showed that in 1979 the Department, pursuant to Section 341.041(3) of the Florida Public Transit Act,[5] developed the *407 Florida Transit System Performance Measures and Standards. Within these standards the Department defined “operating ratio” as total revenue/total operating expenses. The term revenue was defined as including that which was earned by the actual transit system operation. Included were certain classes of revenue as defined in the manual developed by the federal government to comply with Section 15 of the Urban Mass Transportation Act of 1964. Excluded from the definition of revenue is consideration of any federal subsidies. According to the evidence presented, this view of the meaning of operating ratio is also consistent with the Department’s use of the term in other transit matters and studies and with the term’s customary industry usage.
Careful review of Chapter 341 reveals that this is not a case in which one can determine from the statutory provisions whether the legislature intended the term “operating ratio” to include AMTRAK subsidies;[6] if it were such a situation and the language of the statute were clear and not illogical, we would have no problem with the trial court’s judgment. See Vocelle v. Knight Brothers Paper Company, 118 So.2d 664 668 (Fla. 1st DCA 1960).
However, not only is the legislative intent not apparent from a review of Chapter 341, but also the Coalition has failed to present competent substantial evidence supporting the construction it urged in the lower court. This is a textbook case for application of the principle, cited earlier, that deference is to be accorded to an agency’s construction of a statute which it is charged with administering. The Coalition having failed to demonstrate that the Department’s interpretation of the term operating ratio was clearly erroneous, the judgment must be reversed.
In view of our holding on this issue, we need not address the collateral dispute over whether the statutory phrase “reaches an operating ratio of 60 percent” requires that such level be maintained beyond simply one or two months. The evidence shows that, without the inclusion of the AMTRAK subsidy in the operating ratio, the Silver Palm never reached the statutorily required level.
REVERSED.
ERVIN, C.J., and SMITH, J., concur.

. No issue has been raised, either in the lower court or on appeal, regarding the availability of any administrative remedy in connection with the matters adjudicated. We, therefore, assume that the circuit court acted properly in exercising jurisdiction in this case.

. A "rail service development project” is defined by Section 341.301(2) as follows:
(2) "Rail service development project” means a project undertaken by a public agency to determine whether a new or innovative technique or measure can be utilized to improve or expand rail service. The duration of the project funding shall be limited according to the type of project and in no case shall exceed 3 years. Rail service development projects include those projects and other actions undertaken to enhance railroad operating efficiency or increased rail service, including measures that result in improved speed profiles, operations, or technological applications that lead to reductions in operating costs and increases in productivity or service.

. Pertinent portions of Sections 341.301-341.303 are set forth as follows:
341.302 Rail program duties and responsibilities of the department. — The department, in conjunction with other governmental units and the private sector, shall develop and implement a rail program of statewide application designed to ensure the proper maintenance, safety, revitalization, and expansion of the rail system to assure its continued and increased availability to respond to statewide mobility needs. With the resources provided pursuant to chapter 215, the department shall:
(1) Provide the overall leadership, coordination, and financial and technical assistance necessary to assure the effective responses of the state’s rail system to current and anticipated mobility needs.
(2) Promote and facilitate the implementation of advanced rail systems, including high-speed rail and magnetic levitation systems.
(3) Develop and periodically update the rail component of the state transportation plan, on the basis of an analysis of statewide transportation needs. The rail component shall include an identification of priorities, programs, and funding levels required to meet statewide needs. The rail component shall be developed in a manner that will assure the maximum use of existing facilities and the optimum integration and coordination of the various modes of transportation, public and private, in the most cost-effective manner possible.
(4) As part of the 5-year transportation plan of the department, formulate a specific program of projects and financing to respond to identified railroad needs.
(5) Provide technical and financial assistance to units of local government to address identified rail transportation needs.
(6) Secure and administer federal grants and apportionments for rail projects within this state when necessary to further the statewide program.
(7) Develop and administer state standards concerning the safety and performance of rail systems and operations. Such standards shall be developed jointly with representatives of affected rail systems, with full consideration given to nationwide industry norms, and shall define the minimum acceptable standards for safety and performance.
******
(13) Provide new rail service and equipment when:
(a) Pursuant to the transportation planning process, a public need has been determined to exist.
(b) The cost of providing such service does not exceed the sum of revenues from fares charged to users, services purchased by other public agencies, local fund participation, and specific legislative appropriation for this purpose; and
(c) Service cannot be reasonably provided by other governmental or privately owned rail systems.
******
(17) Exercise such functions, powers, and duties in connection with the rail component of the state transportation plan as may be necessary to develop a safe, efficient, and effective statewide transportation system. 341.303 Funding authorization and appropriations; eligibility and participation.—
******
(4) FUND PARTICIPATION; SERVICE DEVELOPMENT.—
(a) The department is authorized to fund up to 50 percent of the capital and net operating costs of any eligible intercity or commuter rail service development project that is local in scope.
(b) The department is authorized to fund up to 100 percent of the capital and net operating costs of any eligible intercity or commuter rail service development project that is statewide in scope or involves more than one county if no other governmental unit of appropriate jurisdiction exists.
(c) Each such local or statewide service development project shall be identified in the appropriation request of the department in a manner that defines project objectives, the assigned operational and financial responsibilities, the time frame required to develop the service, and the criteria by which the success of the project can be judged.
(d) Any service development project funded under this section shall continue to be eligible for such funds in the third year of operation only if the project reaches an operating ratio of 60 percent or more during the second year. All intercity and commuter rail service development projects shall be limited to 3 years. (e) The term "net operating costs” means all operating costs of the project less any federal funds, fares, or other sources of income to the project.

. The Florida Coalition of Rail Passengers, Inc., a Florida corporation, was established in 1982, according to its articles of incorporation, in order to "promote, advance, and otherwise insure continuation of interstate rail passenger service to and from the state of Florida; to promote and encourage legislation and funding by the Florida legislature for 403(b) rail passenger service within the state of Florida; to encourage and/or promote improvement of existing rail passenger facilities within the state of Florida, i.e., station facilities, and the inclusion of station facilities in existing mass transit facilities; and to encourage legislation and funding for intrastate trains as well as light rail and heavy rail mass transit.”

. Section 341.041(3), Florida Statutes (1978 Supp.) required the Department, among other things, to:
(3) Develop, publish, and administer state standards concerning system management, performance, and safety of governmentally owned public transit systems. Such standards shall be developed jointly with representatives of affected transit systems, with full consideration given to nationwide industry norms, and shall define the mínimums ac *407 ceptable to this state, as well as long-range goals.

. We are not unaware of the definition of "net operating costs” found in 341.303(4)(e). However, we find this definition to be inapplicable in determining whether AMTRAK subsidies are to be included in the "operating ratio,” because the term "net operating costs” is used to establish the amount for funding for eligible intercity or commuter rail service development projects ta 341.303(4)(a) & (b). In fact, § 4(b) provides funding of 100% of net operating costs so that any subsidies must necessarily be excluded to prevent projects from collecting both 100% of costs and any subsidies. On the other hand, the term "operating ratio” was chosen to determine eligibility for funding for service development projects, not the amount of funding, and there is not the same potential for "double dipping.”